Sophia M. Rios (SBN 305801)
**BERGER MONTAGUE PC**
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
srios@bergermontague.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| BRENDA MARIE MCATEE,<br>Plaintiff,<br>v.<br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br>Defendant. | Case No.<br>**COMPLAINT**<br>(1) Violation of 15 U.S.C. § 1681e(b)<br>(2) Violation of 15 U.S.C § 1681i<br>(3) Violation of 15 U.S.C § 1681g<br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Brenda Marie McAtee ("Plaintiff"), a living, breathing, 73-year-old consumer, brings this Complaint against Defendant Experian Information Solutions, Inc. ("Experian," "Defendant Experian," or "Defendant") for actual, statutory, and punitive damages, costs, and attorneys' fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of Defendant's mixing of Plaintiff's credit file with information belonging to an unrelated consumer, and thereafter inaccurately reporting Plaintiff as deceased and without a credit score.

## PRELIMINARY STATEMENT

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual citizens. Data technology, whether it be used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individuals to flow immediately to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should benefit from the resulting convenience and efficiency.

2. Unfortunately, however, this information has also become readily available for and subject to mishandling and misuse. Individuals can sustain substantial damage, both emotionally and economically, whenever inaccurate information or fraudulent information is disseminated about them.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. Theses CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, automobile dealers, potential employers, and other similar interested parties) information commonly called "consumer reports," concerning individuals who may be applying for retail credit, to lease an apartment, to obtain a mortgage, auto loan, employment, or the like.

5. "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

6. Congress made the following findings when it enacted the FCRA in 1970:

a) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system;

b) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers;

c) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers; and

d) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a) (1-4).

7. Thus, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

8. Since 1970, when Congress enacted the FCRA, as amended, 15 U.S.C. § 1681 *et seq.*, federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

9. "Mixed files" create a false description and representation of a consumer's credit history.

10. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

11. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

12. Mixed files are not a new phenomenon. Defendant has been put on notice of the existence of mixed files and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

13. More recently, all three credit bureaus, including Defendant, have been the subject of numerous state attorney general actions relating to their mixed file problems.

14. For example, in 2015, the New York Attorney General filed charges and settled claims with Equifax, Experian, and Trans Union over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

15. Notwithstanding Defendant's notice and being subject to repeated enforcement actions, mixed files persist despite consumers' unique personal identifying information, such as Social Security numbers, dates of birth, and addresses.

16. Further, mixed files result in the disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.

---

[1] https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited July 17, 2023; *see also* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited July 17, 2023.

17. All three credit bureaus, including Defendant, have been sued thousands of times wherein an allegation was made that they violated the FCRA. Moreover, Defendant is sued, at a minimum, hundreds of times each year wherein an allegation is made that it mixed a consumers' credit file with that of another person.

18. Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

19. For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000 in actual damages and $5 million in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

20. In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000 in actual damages and $2.7 million in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

21. In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000 in actual damages and $18.4 million in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Millers' numerous disputes. Despite the verdict, Defendant, continues to mix consumers' credit files with other consumers' credit files.

22. Most recently, a jury assessed a $60 million verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers

with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC,* No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

23. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

24. No less than three federal Courts of Appeal have held that a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

25. Finally, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendant, to review their procedures when a mixed file case occurs.

26. Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for Defendant, as well as innocent consumers, including Plaintiff.

## THE PARTIES

27. Plaintiff Brenda Marie McAtee ("Plaintiff") is a natural person who resides in the City of Indianapolis, State of Indiana, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

28. Defendant Experian Information Solutions, Inc. ("Experian," "Defendant Experian," or "Defendant") is a foreign corporation authorized to do business in the State of California, including in the Central District.

29. Defendant Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Defendant Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

31. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

32. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect consumers' rights to fairness and accuracy in the reporting of their credit information.

33. The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

34. The FCRA further requires that when preparing consumer reports, a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

**Defendant Experian's Processing of Credit Information**

35. Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

36. These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

37. Defendant collects information from thousands of furnishers.

38. The process by which Defendant receives, sorts, and stores information is largely electronic.

39. Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

40. Defendant takes the credit information reported by furnishers and creates consumer credit files.

41. Defendant maintains credit files on more than 200 million consumers.

42. Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines")

**Defendant Experian's Mixed File Problem**

43. Defendant knows that different consumers can have similar names.

44. Defendant knows that different consumers can have similar Social Security numbers.

45. Defendant knows that different consumers with similar names can also have similar Social Security numbers.

46. Defendant knows that public records often do not contain identifying information such as Social Security numbers or dates of birth.

47. Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information it maintains about the consumer in the consumer's credit file or files.

48. Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

49. Sometimes Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a mixed or merged credit file.

50. Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, including Defendant, regarding their significant failures and deficiencies with respect to mixed files.

51. Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Experian containing information belonging to another consumer.

52. A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

53. There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms (the database rules) used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

54. The success or failure of these algorithms and rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

55. These rules also determine which credit files are selected by the algorithm and are merged to create a complete consumer report.

56. Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one credit file and/or credit report.

**Defendant Experian's Practices Concerning the Sale of Reports on "Deceased" Consumers**

57. Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

58. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

59. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

60. Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

61. Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

62. Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

63. Defendant does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

64. Defendant does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

65. In some cases, to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedures to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

66. Defendant regularly receives the "Death Master File" from the Social Security Administration, listing by social security number those consumers that the government believes to be deceased. But Defendant does not cross-reference the "X" code received from data furnishers with the Death Master File to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

67. Defendant will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

68. Defendant does not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased

before placing the "deceased" mark on that consumer's report and selling that report for profit.

69. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

70. Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

71. Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

72. Upon Defendant's reports with a "deceased" mark sold to third parties, Defendant never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

73. Defendant knows that third-party credit issuers require a credit score to process a given credit application.

74. Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

75. Defendant knows that living consumers are routinely turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

76. Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because it is reporting the consumer as "deceased" and without a credit score.

77. Defendant has received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

78. Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit report via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

79. Nevertheless, Defendant does not employ reasonable procedures, or any procedures, to assure that a consumer marked as "deceased" on their credit report is, in fact, deceased.

80. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased by Defendant unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

81. Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

82. Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

83. For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

84. Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to it—meaning that no one is continuing to purchase reports about that consumer.

85. Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

86. Defendant profits from the sale of reports on deceased consumers.

87. Defendant has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

88. Defendant knows that truly deceased consumers do not apply for credit.

89. Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

90. Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

91. Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer’s credit information or report.

92. Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer’s information.

93. Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a “permissible purpose” for purchasing or using a (supposedly) deceased consumer’s credit history and/or report.

94. For deceased consumers, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell its credit reports, absent a court order.

95. Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**JP Morgan Chase Bank Denies Plaintiff's Credit Application in April 2024**

96. In or about April 19, 2024, Plaintiff applied for a JP Morgan Chase Bank ("JPMCB") credit card.

97. As part of her credit application, Plaintiff provided JPMCB with her personal identification information, including her Social Security number, and authorized it to access her credit report(s).

98. On or about April 19, 2024, in order to determine whether Plaintiff qualified for the credit that she sought, JPMCB purchased Plaintiff's credit score and report from Experian.

99. Experian reported a total of twenty-two (22) accounts that do not belong to Plaintiff, but rather, belong to an unrelated consumer. Experian also reported items of personal information that do not belong to Plaintiff, such as an inaccurate name, date of birth, and addresses. In addition, Experian failed to return a credit score for Plaintiff and reported Plaintiff as "Deceased" in relation to seven (7) of the twenty-two (22) accounts that do not belong to Plaintiff.

100. Experian's reporting was grossly inaccurate: Plaintiff is alive and has a credit score. Furthermore, the aforementioned twenty-two (22) tradelines and items of personal information do not belong to Plaintiff.

101. JPMCB was unable to approve Plaintiff for credit because Experian was reporting Plaintiff as deceased and, consequently, Experian was not returning a score for Plaintiff.

102. Due to Experian's inaccurate reporting, Plaintiff was denied the credit she sought and needed.

**LoanDepot.com LLC Denies Plaintiff's Credit Applications for a Home Equity Line of Credit in June 2024**

103. In or about June 2024, Plaintiff began searching for options for a home equity line of credit (a "HELOC") to help make ends meet and cover living expenses for her family.

104. On or about June 20, 2024, Plaintiff applied for a HELOC through LoanDepot.com LLC ("LoanDepot").

105. As part of her credit application, Plaintiff provided LoanDepot with her personal identification information, including her Social Security number, and authorized it to access her credit report(s).

106. On or about June 20, 2024, LoanDepot requested Plaintiff's credit report and score from Experian in the form of an Infile Credit Report from CoreLogic Credco.

107. CoreLogic Credco purchased Plaintiff's credit file from Experian and assembled her information into an Infile Credit Report, which it sold to LoanDepot.

108. Experian reported a total of twenty-two (22) accounts that do not belong to Plaintiff, but rather, belong to an unrelated consumer. Experian also reported items of personal information that do not belong to Plaintiff, such as an inaccurate name, date of birth, and addresses. In addition, Experian failed to return a credit score for Plaintiff and reported Plaintiff as "Deceased" in relation to seven (7) of the twenty-two (22) accounts that do not belong to Plaintiff.

109. On or about June 25, 2024, confused as to what else she could possibly do, Plaintiff reapplied for a HELOC with LoanDepot.

110. On or about June 25, 2024, LoanDepot requested Plaintiff's credit report and score from Experian in the form of an Infile Credit Report from CoreLogic Credco for a second time.

111. CoreLogic Credco purchased Plaintiff's credit file from Experian and assembled her information into an Infile Credit Report, which it sold to LoanDepot.

112. Experian again reported a total of twenty-two (22) accounts that do not belong to Plaintiff, but rather, an unrelated consumer. Experian again also reported items of personal information that do not belong to Plaintiff, such as an inaccurate name, date of birth, and addresses. In addition, Experian again failed to return a credit score for Plaintiff and reported Plaintiff as "Deceased" in relation to seven (7) of the twenty-two (22) accounts that do not belong to Plaintiff.

113. Experian's reporting was grossly inaccurate: Plaintiff is alive and has a credit score. Furthermore, the aforementioned twenty-two (22) tradelines and items of personal information do not belong to Plaintiff.

114. Loan Depot was unable to approve Plaintiff for credit on two occasions because Experian was inaccurately reporting Plaintiff as deceased and, consequently, Experian was not returning a score for Plaintiff.

115. Due to Experian's inaccurate reporting, Plaintiff was denied the credit she sought and needed.

**Rocket Mortgage, LLC Bank Denies Plaintiff's Application for a Home Equity Line of Credit in December 2024**

116. On or about December 30, 2024, in order to pay for late husband's funeral expenses and purchase a headstone for him while also taking care of herself and her stepson, Plaintiff applied for a HELOC through Rocket Mortgage, LLC ("Rocket Mortgage").

117. As part of her credit application, Plaintiff provided Rocket Mortgage with her personal identification information, including her Social Security number, and authorized it to access her credit report(s).

118. On or about December 30, 2024, Rocket Mortgage requested Plaintiff's credit report and score from Experian in the form of an Infile Credit Report from Xactus.

119. Xactus purchased Plaintiff's credit file from Experian and assembled her information into an Infile Credit Report, which it sold to Rocket Mortgage.

120. Experian again reported a total of twenty-two (22) accounts that do not belong to Plaintiff, but rather, an unrelated consumer. Experian also reported items of personal information that do not belong to Plaintiff. In addition, Experian failed to return a credit score for Plaintiff and reported Plaintiff as "Deceased" in relation to eight (8) of the twenty-two (22) accounts that do not belong to Plaintiff.

121. Experian's reporting was grossly inaccurate: Plaintiff is alive and has a credit score. Furthermore, the aforementioned twenty-two (22) tradelines and items of personal information do not belong to Plaintiff, but rather, an unrelated consumer.

122. Rocket Mortgage was unable to approve Plaintiff for credit because Experian was reporting Plaintiff as deceased and, consequently, Experian was not returning a score for Plaintiff.

123. Due to Experian's inaccurate reporting, Plaintiff was denied the credit she sought and needed.

**Defendant Experian Fails to Provide Plaintiff a Copy of her Credit Report in July 2025**

124. On or about July 10, 2025, concerned about Defendant's inaccurate reporting, Plaintiff requested a copy of her Experian credit file pursuant to U.S.C. § 1681g of the FCRA through AnnualCreditReport.com.

125. Defendant denied Plaintiff access to her credit report.

126. Experian failed to provide Plaintiff with a copy of her credit report pursuant to Plaintiff's July 2025 request for the same, in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681g.

**Plaintiff Confirms Defendant Experian's Deceased Credit Reporting in July 2025**

127. On or about July 15, 2025 after being unable to access her Experian report online, Plaintiff mailed a request for her Experian report to Defendant via an Annual Credit Report Request Form.

128. On or about July 21, 2025, in response to Plaintiff's second request, Defendant mailed Plaintiff a copy of her Experian credit report.

129. Upon review, Plaintiff discovered that Experian was reporting personal and credit information that does not belong to her, but rather, belongs to an unrelated consumer, including *twenty-two* (22) accounts that do not belong to her, eight (8) of which included a "Deceased" notation.

130. Specifically, Experian was reporting Plaintiff as deceased in conjunction with the following eight (8) tradelines that do not belong to Plaintiff, yet appeared on her Experian credit report as follows:

1. Account: DISCOVER BANK
Account Number: 601100669066
ECOA: Deceased
Opened: 05/01/2000
Last Activity: 08/31/2021
Reported: 02/15/2022
Credit Limit: $15,000
Account Type: Revolving
Maximum Delinquency: 01/2020, $3,822
Manner of Payment: Charged Off
Comment: Delinq 180

2. Account: FIRST PREMIER BANK
Account Number: 5178006806537009
ECOA: Deceased
Opened: 08/31/2020
Last Activity: 03/30/2021
Reported: 01/09/2022
Credit Limit: $700
Account Type: Revolving
Maximum Delinquency: $522
Manner of Payment: Charged Off
Comment: Delinq 120

3. Account: SYNCB/BELK
Account Number: 604583153069
ECOA: Deceased

Opened: 01/17/2010
Last Activity: 01/06/2021
Reported: 03/04/2022
Credit Limit: $410
High Credit: $413
Account Type: Revolving
Maximum Delinquency: 02/2020, 30-59 Days Late
Manner of Payment: Current
Comment: Curr Was 30

4. Account: SYNCB/JCP
Account Number: 600889294244
ECOA: Deceased
Opened: 08/08/2008
Last Activity: 01/11/2021
Reported: 03/04/2022
Credit Limit: $4,000
High Credit: $380
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct

5. Account: SYNCB/LOWES
Account Number: 798192618488
ECOA: Deceased
Opened: 10/08/2018
Last Activity: 04/08/2021
Reported: 03/04/2022
Credit Limit: $6,300
High Credit: $528
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct

6. Account: SYNCB/TJX COS DC
Account Number: 5243661073625381
ECOA: Deceased
Opened: 07/05/2017
Last Activity: 07/08/2021
Reported: 03/08/2022
Credit Limit: $250

Account Type: Revolving
Maximum Delinquency: $328
Manner of Payment: Charged Off
Comment: Delinq 150

7. Account: US BANK
Account Number: NOT REPORTED (in Xactus Report Dated 12/30/2024, Reported with Account Number 527854000909…. in Experian Report dated 7/21/2025)
ECOA: Deceased
Opened: 04/01/2018
Last Activity: 04/16/2019
Closed: 08/2024
Reported: 08/31/2024
Credit Limit: $5,200
Account Type: Revolving
Maximum Delinquency: 07/2022, $4,724
Manner of Payment: Charged Off
Comment: Delinq 150/ACCOUNT CLOSED AT CREDIT GRANTER'S REQUEST

8. Account: US BANK
Account Number: 0871
ECOA: Deceased
Opened: 07/01/2011
Last Activity: 10/01/2021
Reported: 02/28/2022
Credit Limit: $7,500
High Credit $3,812
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct

131. In addition, Experian was reporting the following fourteen (14) tradelines that do not belong to Plaintiff, which appeared on her Experian credit report as follows:

1. Account: BANK OF AMERICA
Account Number: 6544

ECOA: Authorized User
Opened: 01/29/2003
Last Activity: 01/06/2012
Closed: 06/2016
Reported: 06/14/2016
Credit Limit: $14,500
High Credit: $860
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CONSUMER'S REQUEST

2. Account: BANK OF AMERICA
Account Number: 0204
ECOA: Individual
Opened: 05/17/1999
Last Activity: 05/03/2018
Closed: 09/2015
Reported: 06/21/2018
Credit Limit: $23,500
High Credit: $3,807
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CONSUMER'S REQUEST

3. Account: COMENITY BANK/MAURICES
Account Number: 8544747697
ECOA: Individual
Opened: 10/29/2013
Last Activity: 11/03/2014
Closed: 02/2015
Reported: 02/07/2015
Credit Limit: $1,000
High Credit: $58
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CONSUMER'S REQUEST

4. Account: AMEX

Account Number: 3499922852808953
ECOA: Individual
Opened: 11/06/2015
Last Activity: 01/03/2020
Closed: 01/2020
Reported: 01/03/2020
Credit Limit: $1,000
High Credit: $1,713
Account Type: Revolving
Manner of Payment: Charged Off
Comment: Curr Acct/ACCOUNT PAID IN FULL FOR LESS THAN THE FULL BALANCE

5. Account: AMEX
Account Number: 3499926368205673
ECOA: Individual
Opened: 11/14/2018
Last Activity: 09/25/2020
Closed: 09/2020
Reported: 09/25/2020
Credit Limit: $1,000
Account Type: Revolving
Maximum Delinquency: $1,036
Manner of Payment: Charged Off
Comment: Settled/ACCOUNT PAID IN FULL FOR LESS THAN THE FULL BALANCE

6. Account: COMENITY BANK/BURKES OL
Account Number: 5856373460451722
ECOA: Individual
Opened: 10/11/2010
Last Activity: 05/20/2021
Closed: 05/2024
Reported: 05/2024
Credit Limit: $650
High Credit: $621
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CREDIT GRANTER'S REQUEST

7. Account: COMENITY BANK/GOODYS
Account Number: 5856373820063001
ECOA: Individual
Opened: 09/21/2009
Last Activity: 03/18/2019
Closed: 03/2020
Reported: 03/14/2020
Credit Limit: $750
High Credit: $196
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CREDIT GRANTER'S REQUEST

8. Account: JPMCB CARD
Account Number: 426684150879
ECOA: Individual
Opened: 09/30/2011
Last Activity: 01/30/2017
Closed: 01/2017
Reported: 01/30/2017
Credit Limit: $2,500
High Credit: $2,639
Account Type: Revolving
Manner of Payment: Current
Comment: Curt Acct/ACCOUNT CLOSED AT CONSUMER'S REQUEST

9. Account: MACYS/CBNA
Account Number: 417075293750
ECOA: Individual
Opened: 02/01/2006
Last Activity: 09/22/2010
Closed: 03/2018
Reported: 03/06/2018
Credit Limit: $100
High Credit: $150
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/CLOSED DUE TO INACTIVITY

10. Account: SYNCB/BELK DUAL CARD
Account Number: 524300100423
ECOA: Individual
Opened: 06/13/2018
Last Activity: 03/13/2019
Closed: 11/2019
Reported: 11/04/2019
Credit Limit: $100
High Credit: $128
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CREDIT GRANTER'S REQUEST

11. Account: SYNCB/LOWES
Account Number: 798192418194
ECOA: Individual
Opened: 04/30/2006
Last Activity: 10/11/2012
Paid: 11/2016
Reported: 11/23/2016
Credit Limit: $0
High Credit: $488
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct

12. Account: SYNCB.OLDNAVYDC
Account Number: 447995167480
ECOA: Individual
Opened: 10/16/2013
Last Activity: 01/16/2015
Closed: 02/2015
Reported: 02/08/2015
Credit Limit: $2,400
High Credit: $50
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CONSUMER'S REQUEST

13. Account: WFBNA CARD
Account Number: 5774422004466024
ECOA: Individual
Opened: 02/04/2016
Last Activity: 03/09/2016
Closed: 10/2017
Reported: 10/10/2017
Credit Limit: $1,200
High Credit: $47
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CONSUMER'S REQUEST

14. Account: WFBNA CARD
Account Number: 5774421758572201
ECOA: Individual
Opened: 12/29/2015
Last Activity: 05/24/2019
Closed: 12/2020
Reported: 12/02/2020
Credit Limit: $3,400
High Credit: $1,368
Account Type: Revolving
Manner of Payment: Current
Comment: Curr Acct/ACCOUNT CLOSED AT CONSUMER'S REQUEST

132. Furthermore, Experian was reporting inaccurate names, a Social Security Number variation, and telephone numbers that do not belong to Plaintiff , which appeared on her Experian credit report as follows:

Names:

1. BRENDA HENSON;
2. BRENDA H HENSON;
3. BRANDA MCATEE;
4. BRENDA MCATTEE;
5. BRENDA M MEATEE;
6. BRENDA MACATY; and

7. BRENDA MC ATEE.

Address:

1. 9782 RUSSELL SPRINGS RD, RUSSELL SPRINGS KY 42642-7722;
2. 4982 RUSSELL SPGS, RUSSELL SPRINGS KY 42642;
3. 505 BUCK WATSON RD, COLUMBIA KY 42728-8875;
4. PO BOX 265, RUSSELL SPRINGS KY 42642-0265; and
5. 288 HUTCHISON LOY RD, COLUMBIA KY 42728-8809.

Date of Birth:

1. 06/01/1952.

Social Security Number Variation:

1. XXX-XX-5015.

Telephone Numbers:

1. 270 634-3222;
2. 270 250-4792; and
3. 270 384-3084.

133. Experian's deceased reporting and reporting of personal and credit information in Plaintiff's credit file and reports that does not belong to Plaintiff was grossly inaccurate: Plaintiff is not deceased and has a credit score.

134. Experian's deceased reporting and reporting of personal and credit information in Plaintiff's credit file and reports that does not belong to Plaintiff was also inaccurate and misleading as it further misrepresented her credit history, credit usage, debt-to-income ratio, and overall creditworthiness.

135. Plaintiff's credit score was adversely affected as a result of Experian's mixing of Plaintiff's credit file with that of a presumably deceased unrelated consumer, namely by reporting Plaintiff as deceased and without a credit score and reporting multiple accounts on Plaintiff's credit file that do not belong to her.

136. As a result of Experian's inaccurate deceased and mixed reporting, Experian made it practically impossible for Plaintiff to obtain credit.

**Plaintiff Disputes with Defendant Experian in July 2025**

137. On or about July 30, 2025, extremely worried, stressed, and anxious due to Experian's inaccurate reporting, Plaintiff mailed a written dispute letter to Experian disputing the ownership of the above referenced twenty-two (22) tradelines, the ECOA of "Deceased" which was associated with the aforementioned eight (8) tradelines, and the personal identification information appearing on her Experian credit report that does not belong to her.

138. Along with her dispute letter, Plaintiff included a copy of her driver's license, Social Security card, Xactus credit report dated December 30, 2024, and Experian credit report dated July 21, 2025 showing the inaccurate accounts, deceased notations, and items of personal information.

139. Plaintiff insisted that she is in fact alive, not dead, and requested Experian remove any and all deceased notations from her credit report, as well as all twenty-two (22) tradelines and items of personal information that do not belong to her.

140. Plaintiff requested that Experian investigate the disputed information, correct its reporting, and send her an updated copy of her credit report.

**Defendant Experian's Method for Considering Consumer Credit Report Disputes**

141. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

142. The credit bureaus, including Experian, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency- created prompts for automated consumer dispute verifications to the

appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

143. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

144. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

145. Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

146. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

147. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

148. Upon receiving a dispute from a consumer, the credit bureaus, including Experian, have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

149. The data furnishers then have an obligation under the FCRA to conduct a reasonable investigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

150. Once the data furnisher completes its investigation, it will code the ACDV accordingly, representing either that the disputed account was verified as

accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**Defendant Experian Fails to Conduct a Reasonable Reinvestigation of or Respond to Plaintiff's July 2025 Dispute**

151. Plaintiff never heard back from Experian regarding her July 2025 dispute.

152. Experian failed to conduct a reasonable reinvestigation, or any reinvestigation whatsoever, of the twenty-two (22) inaccurate tradelines that do not belong to Plaintiff, including eight (8) tradelines with inaccurate deceased notations, and the inaccurate personal identification information disputed by Plaintiff in July 2025, in violation of 15 U.S.C. § 1681i.

**Defendant Experian Fails to Provide Plaintiff a Copy of her Credit Report a Second Time in September 2025**

153. On or about September 5, 2025, after not hearing back from Experian regarding her July 2025 dispute and still concerned about its inaccurate reporting, Plaintiff requested a copy of her Experian credit file pursuant to U.S.C. § 1681g of the FCRA.

154. Plaintiff was unable to access her Experian report online.

155. Defendant failed to provide Plaintiff with a copy of her credit report pursuant to Plaintiff's September 2025 request for the same, in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681g.

**Plaintiff Disputes with Defendant Experian in September 2025**

156. On or about September 12, 2025, stressed, anxious, and desperately trying to get Experian to correct her report, Plaintiff mailed a second written dispute letter to Experian.

157. Along with her dispute letter, Plaintiff included a copy of her driver's license, Social Security card, Xactus credit report dated December 30, 2024,

CoreLogic Credco Report dated June 25, 2024, and Experian credit report dated July 21, 2025 showing the inaccurate accounts, deceased notations, and items of personal information.

158. Plaintiff insisted that she is in fact alive, not dead, and requested Experian remove any and all deceased notations from her credit report, as well as all twenty-two (22) tradelines and items of personal information that do not belong to her.

159. Plaintiff requested that Experian investigate the disputed information, correct its reporting, and send her an updated copy of her credit report.

**Defendant Experian's Response to Plaintiff's September 2025 Dispute**

160. On or about September 25, 2025, Plaintiff received Experian's response to her second dispute.

161. Upon review, Plaintiff was relieved to discover that Experian appeared to have finally corrected her credit report.

162. As a result of Defendant's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied credit, including being denied at least one (1) credit card and a HELOC on at least three (3) occasions; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating, debt-to-income ratio, and overall creditworthiness; being chilled from seeking additional credit opportunities; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, stress; anxiety; loss of sleep; the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another presumably deceased consumer's personal and credit account information mixed into her credit files; and the stress of having false and misleading information circulated about her through her consumer reports.

163. At all times pertinent hereto, Experian was acting by and through its agents, servants, and/or employees who were acting within the course and scope of

their agency or employment, and under the direct supervision and control of Experian.

164. At all times pertinent hereto, the conduct of Experian, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in complete disregard for federal law and the rights of Plaintiff herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Experian)

165. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-164 as if fully stated herein.

166. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

167. On at least four occasions, Defendant prepared and published a patently false consumer report concerning Plaintiff.

168. Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold and prepared such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

169. Defendant also mixed Plaintiff's personal and credit account information with that of an unrelated consumer into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

170. Defendant violated 15 U.S.C. § 1681e(b) of the FCRA by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of the credit reports it published and maintains concerning Plaintiff.

171. As a result of Defendant's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied credit, including being denied at least one (1) credit card and a HELOC on at least three (3) occasions; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating, debt-to-income ratio, and overall creditworthiness; being chilled from seeking additional credit opportunities; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, stress; anxiety; loss of sleep; the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another presumably deceased consumer's personal and credit account information mixed into her credit files; and the stress of having false and misleading information circulated about her through her consumer reports.

172. Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

173. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
## Failure to Perform a Reasonable Reinvestigation
## (Second Claim for Relief Against Defendant Experian)

174. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-164 as if fully stated herein.

175. The FCRA mandates that Defendant investigates the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The

FCRA imposes a 30-day time limitation for the completion of such an investigation. *Id.*

176. The FCRA provides that if Defendant conducts an investigation of disputed information and confirms that the information is, in fact, inaccurate or is unable to verify the accuracy of the disputed information, it is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

177. On at least two separate occasions, Plaintiff lodged disputes with Defendant pleading with it to comply with its statutory reinvestigation obligations and correct and/or delete specific items in her credit file that are patently inaccurate, misleading, and highly damaging to her ability to obtain credit, namely, reporting Plaintiff as deceased and without a credit score and reporting numerous accounts and personal identification information that do not belong to her.

178. On at least one occasion, Defendant failed to reinvestigate Plaintiff's dispute, or such reinvestigation was so shoddy as to allow patently false and highly damaging information to remain on Plaintiff's credit file and report, namely, continuing to report Plaintiff as deceased and continuing to report Plaintiff with numerous accounts and personal identification information that does not belong to her, but rather, to an unrelated consumer.

179. Defendant violated 15 U.S.C. § 1681i of the FCRA on at least one occasion by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the disputed information; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file and report.

180. As a result of Defendant's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied credit, including being denied at least one (1) credit card and a HELOC on at least three (3) occasions; loss of the ability to purchase and benefit from her good name and credit

rating; detriment to her credit rating, debt-to-income ratio, and overall creditworthiness; being chilled from seeking additional credit opportunities; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, stress; anxiety; loss of sleep; the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another presumably deceased consumer's personal and credit account information mixed into her credit files; and the stress of having false and misleading information circulated about her through her consumer reports.

181. Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

182. Plaintiff is entitled to recover attorney's fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681g**
**Failure to Provide Plaintiff with her Credit File**
**(Third Claim Against Defendant Experian)**

183. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-164 as if fully stated herein.

184. The FCRA mandates that:

Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title, clearly and accurately disclose to the consumer:

(1) All information in the consumer's file at the time of the request;

(2) The sources of the information;

(3)(A) Identification of each person;

(4) The dates, original payees, and amounts of any checks upon

> which is based any adverse characterization of the consumer, included in the file at the time of the disclosure.
>
> (5) A record of all inquiries received by the agency during the 1-year period preceding the request that identified the consumer in connection with a credit or insurance transaction that was not initiated by the consumer.
>
> (6) If the consumer requests the credit file and not the credit score, a statement that the consumer may request and obtain a credit score.

15 U.S.C. § 1681g.

185. Defendant violated 15 U.S.C. § 1681g of the FCRA by failing to provide Plaintiff with her credit files and reports on at least two occasions, despite having received requests for the same, along with documents proving her identity and current address.

186. As a result of Defendant's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied credit, including being denied a HELOC on at least three (3) occasions; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating, debt-to-income ratio, and overall creditworthiness; being chilled from seeking additional credit opportunities; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, stress; anxiety; loss of sleep; the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another presumably deceased consumer's personal and credit account information mixed into her credit files; and the stress of having false and misleading information circulated about her through her consumer reports.

187. Defendants' conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was

negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

188. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a) Determining that Defendant negligently and/or willfully violated the FCRA;

b) Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c) Awarding Plaintiff reasonable attorneys' fees and costs from Defendant as provided by the FCRA; and

d) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Respectfully submitted,

**BERGER MONTAGUE PC**

Dated: January 29, 2026

*<u>/s/ Sophia M. Rios</u>*
Sophia M. Rios (SBN 305801)
**BERGER MONTAGUE PC**
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
srios@bergermontague.com

Bryan L. Plaster, MN Bar No. 0402792*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413

Telephone: (651) 728-5423
Fax: (612) 584-4470
bplaster@bergermontague.com
**Pro Hac Vice Forthcoming*

*Counsel for Plaintiff*
*Brenda Marie McAtee*